# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **CHARLES J. SIPES,** | : | |
| **Plaintiff** | : | **CIVIL ACTION NO. 3:12-01097** |
| **vs.** | : | **(JUDGE MANNION)** |
| **CAROLYN W. COLVIN, ACTING COMMISSIONER OF SOCIAL SECURITY,** | : | |
| | : | |
| **Defendant** | : | |

## MEMORANDUM

## BACKGROUND

The above-captioned action is one seeking review of a decision of the Commissioner of Social Security ("Commissioner") denying Plaintiff Charles J. Sipes's claim for social security supplemental security income (SSI) benefits.

Sipes protectively filed his application for SSI benefits on January 14, 2009. Tr. 40, 123-128, 133 and 168.[1] The application was initially denied by the Bureau of Disability Determination on July 23, 2009. Tr. 12 and 41-52. On August 5, 2009, Sipes requested a hearing before an (ALJ). Tr. 12 and 53-55. A hearing was held before an ALJ on November 15, 2010. Tr. 23-38. Sipes was represented by counsel at the hearing. Id. On November 23, 2010, the ALJ issued a decision denying Sipes's application. Tr. 12-22. The ALJ, after

---

[1]References to "Tr.__" are to pages of the administrative record filed by the Defendant as part of the Answer on August 15, 2012.

considering the medical records and the testimony of Sipes and a vocational expert, found that Sipes had no past relevant work but could perform the full range of light work and considering Sipes's age, education and work experience, he was not disabled pursuant to Medical-Vocational Rule 202.20. Tr. 21.

On December 20, 2010, Sipes filed a request for review with the Appeals Council. The Appeals Council on May 14, 2012, concluded that there was no basis upon which to grant Sipes's request for review. Tr. 1-4 and 6-7.

Sipes then filed a complaint in this court on June 11, 2012. Supporting and opposing briefs were submitted and the appeal became ripe for disposition on October 18, 2012, when Sipes filed a reply brief.

Sipes was born on April 20, 1978, and at all times relevant to this matter was considered a "younger individual" whose age would not seriously impact his ability to adjust to other work. 20 C.F.R. §416.963(c). Tr. 34, 62, 130 and 137.

Sipes, who withdrew from school in 1994 after completing the 7th grade and who obtained a General Equivalency Diploma in 2007, can read, write, speak and understand the English language and perform basic mathematical functions such as paying bills, counting change, handling a savings account and using a checkbook and money orders. Tr. 27, 136, 142 and 150. Sipes reported that he attended Central Fulton School District, McConnellsburg, Pennsylvania from the 1980s to 1994 and while attending school had special education classes in English and Math. Tr. 142. He also stated that he completed training in welding in 1995. Id.

Sipes has a very limited work and earnings history. Tr. 129-130, 160 and 179.  The records of the Social Security Administration reveal that Sipes had earnings in the years 1994 through 1998. Tr. 129. Sipes's reported annual earnings ranged from a low of $226.50 in 1998 to a high of $2866.64

in 1996. Id.  Sipes's total earnings during those 5 years were $7954.56. Id.

Sipes stated that he stopped working on December 31, 1998, because he "[w]as not being paid on time." Tr. 137. However, a "Developmental Summary" contained within the administrative record reveals that Sipes was incarcerated in 1998 and also that he was incarcerated from January, 2004, to June, 2008, at the Pennsylvania State Correctional Institution at Somerset (SCI-Somerset). Tr. 317-318.

In various filings with the Social Security Administration Snipes stated that he worked as a laborer, cook, trail cleaner, tree cutter, painter and built pools. Tr. 130-131, 160 and 179.

The earnings records from the Social Security Administration, however, reveals that Sipes worked for Wendy's and Barony Tree Farms in 1995; he worked for the Commonwealth of Pennsylvania, JLG Industries, Inc., and PAB Roof Truss Fabricators, Inc., in 1996; he worked for Delhaize America, LLC, in 1997; and he worked for David H. Hazard, Swim in the Pool, in 1998. Tr. 130-131. It is not clear when Sipes actually ceased all work because in May of 2009 Sipes told a physician who was evaluating him on behalf of the Bureau of Disability Determination that "he worked as a carpenter up until 2002. Tr. 288. Also, the medical records from SCI-Somerset suggest that while incarcerated he was working as a welder. Tr. 215.

The record reveals that Sipes has a history of alcohol and drug abuse as well as criminal convictions. Tr. 124, 186, 288, 317-318. Sipes also reported smoking one-half pack of cigarettes per day for 13 years. Tr. 228.

Sipes in his application for SSI benefits and other documents filed with the Social Security Administration claims that he became disabled on January 1, 2006. Tr. 123 and 137. Sipes claimed that he was unable to work solely because of a "[l]ower back bone problem." Tr. 137. He stated that he could not sit or stand for any length of time, he had trouble picking things up, he

could "barely bend over to lift up [his] kids" and he had "trouble sleeping at night as well because of [the] pain." Id. Sipes testified at the administrative hearing that the causes of his lower back condition were two falls that occurred in 2006. Tr. 27. He stated that he "fell once" and "then a couple days later" he "was at work and [he] went down two flights of steps." Id. Sipes alleges that he developed back pain after these incidents.[2] Id.

Sipes also reported that he lives in a house by himself but that his stepson stays with him during the week and despite his reported impairments he is able to attend to his personal care without difficulty, prepare simple meals, engage in some housework and laundry, go out side "about every other day," drive, shop for groceries, and "read [and] watch TV [] everyday." Tr. 147-151. Sipes stated that he needs no special reminders to take care of his personal needs and grooming or reminders to take his medicines. Tr. 149. He also needs no reminders "to go places." Tr. 151. In the "Function Report - Adult" completed by Sipes, he alleged that his impairments impacted the following: lifting, squatting, bending, standing, walking, sitting, kneeling and stair climbing. Id. Sipes reported that he finishes what he starts such as a conversation, chores, reading and watching a movie; he is "good" at following written and oral instructions and getting along with authority figures; he has never been fired from a job because of problems getting along with other people; he is "good" at handling stress and changes in routine; and he has not "noticed any unusual behavior or fears." Tr. 152-153. Sipes claims that he has "constant pain" and that it controls his life. Tr. 154.

At the administrative hearing, Sipes described his pain as presently

---

[2]Interestingly, in a pre-hearing brief submitted by Sipes's counsel to the ALJ, counsel stated that "Sipes began to experience serious lower back pain after he slipped and fell down several stairs during his incarceration at SCI Somerset on February 28, 2008." Tr. 186.

being a 10 on a scale of 1 to 10; that the pain shoots up his spine and into the back of his head and that he gets severe headaches during the day; he stated that he has a headache at least once a day and that his treating physicians told him that they "probably com[e] from [his] lower back;" he reported that he takes pain medications and that the medications make him "drowsy" and sometimes "confused." Tr. 28-29. Sipes's medications at the time of the administrative hearing were Tramadol[3] and Flexeril.[4] Tr. 30. With respect to everyday activities, Sipes testified that he has raked leaves but that he has to do "a little bit" then stop and that he cannot stand for more than 15 minutes because his legs start going numb and that at times he stumbles. Id. Sipes described sharp, shooting, burning pain down the right side of his right leg into his knee. Tr. 31. He also reported having difficulty playing with his three children, difficulty driving and sitting for long periods of time because of back pain and headaches. Tr. 31-32.

In a pre-hearing cover-sheet submitted to the administrative law judge, Sipes stated that his severe impairments were as follows: "Lumbar facet syndrome at L4/L5, L5/S1 with L4/5 radiculopathy"[5] and he contended that his

---

[3]"Tramadol "is a narcotic-like pain reliever . . . used to treat moderate to sever pain" Tramadol, Drugs.com, http://www.drugs.com/tramadol.html.

[4]Flexeril "is a muscle relaxant. Flexeril, Drugs.com, http://www.drugs.com/flexeril.html.

[5] The Facet joints are the joint structures that connect the vertebra to one another. Facet joint disease, Department of Anesthesiology, Division of Pain Medicine, New York University Lagone Medical Center, http://pain-medicine.med.nyu.edu/patient-care/conditions-we-treat/facet-joint-disease.

Radiculopathy is a condition where one or more nerves or nerve roots are affected and do not work properly causing foraminal impingement of an

residual functional capacity (RFC) was less than sedentary based on a medical source statement prepared by his treating physician, William L. Milroth, M.D. Tr. 183.

For the reasons set forth below we will affirm the decision of the Commissioner denying Sipes's application for SSI benefits.

## STANDARD OF REVIEW

When considering a social security appeal, we have plenary review of all legal issues decided by the Commissioner. See Poulos v. Commissioner of Social Security, 474 F.3d 88, 91 (3d Cir. 2007); Schaudeck v. Commissioner of Social Sec. Admin., 181 F.3d 429, 431 (3d Cir. 1999); Krysztoforski v. Chater, 55 F.3d 857, 858 (3d Cir. 1995). However, our review of the Commissioner's findings of fact pursuant to 42 U.S.C. §405(g) is to determine whether those findings are supported by "substantial evidence." Id.; Brown v. Bowen, 845 F.2d 1211, 1213 (3d Cir. 1988); Mason v. Shalala, 994 F.2d 1058, 1064 (3d Cir. 1993). Factual findings which are supported by substantial evidence must be upheld. 42 U.S.C. §405(g); Fargnoli v. Massanari, 247 F.3d 34, 38 (3d Cir. 2001)("Where the ALJ's findings of fact are supported by substantial evidence, we are bound by those findings, even if we would have decided the factual inquiry differently."); Cotter v. Harris, 642 F.2d 700, 704 (3d Cir. 1981)("Findings of fact by the Secretary must be accepted as conclusive by a reviewing court if supported by substantial evidence."); Keefe v. Shalala, 71 F.3d 1060, 1062 (2d Cir. 1995); Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001); Martin v. Sullivan, 894 F.2d 1520, 1529 & 1529 n.11 (11th Cir. 1990).

---

exiting nerve. See, generally, Radiculopathy, MedicineNet.com, http://www.medicinenet.com/radiculopathy/article.htm

Substantial evidence "does not mean a large or considerable amount of evidence, but 'rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Pierce v. Underwood, 487 U.S. 552, 565 (1988)(quoting Consolidated Edison Co. v. N.L.R.B., 305 U.S. 197, 229 (1938)); Johnson v. Commissioner of Social Security, 529 F.3d 198, 200 (3d Cir. 2008); Hartranft v. Apfel, 181 F.3d 358, 360 (3d Cir. 1999). Substantial evidence has been described as more than a mere scintilla of evidence but less than a preponderance. Brown, 845 F.2d at 1213. In an adequately developed factual record substantial evidence may be "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." Consolo v. Federal Maritime Commission, 383 U.S. 607, 620 (1966). Substantial evidence exists only "in relationship to all the other evidence in the record," Cotter, 642 F.2d at 706, and "must take into account whatever in the record fairly detracts from its weight." Universal Camera Corp. v. N.L.R.B., 340 U.S. 474, 488 (1971). A single piece of evidence is not substantial evidence if the Commissioner ignores countervailing evidence or fails to resolve a conflict created by the evidence. Mason, 994 F.2d at 1064. The Commissioner must indicate which evidence was accepted, which evidence was rejected, and the reasons for rejecting certain evidence. Johnson, 529 F.3d at 203; Cotter, 642 F.2d at 706-707. Therefore, a court reviewing the decision of the Commissioner must scrutinize the record as a whole. Smith v. Cellophane, 637 F.2d 968, 970 (3d Cir. 1981); Dobrowolsky v. Cellophane, 606 F.2d 403, 407 (3d Cir. 1979).

## SEQUENTIAL EVALUATION PROCESS

To receive disability benefits, the plaintiff must demonstrate an "inability

to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §432(d)(1)(A). Furthermore,

> [a]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work. For purposes of the preceding sentence (with respect to any individual), "work which exists in the national economy" means work which exists in significant numbers either in the region where such individual lives or in several regions of the country.

42 U.S.C. §423(d)(2)(A).

The Commissioner utilizes a five-step process in evaluating SSI claims. See 20 C.F.R. §416.920; Poulos, 474 F.3d at 91-92. This process requires the Commissioner to consider, in sequence, whether a claimant (1) is engaging in substantial gainful activity,[6] (2) has an impairment that is severe or a combination of impairments that is severe,[7] (3) has an impairment or

---

[6]If the claimant is engaging in substantial gainful activity, the claimant is not disabled and the sequential evaluation proceeds no further. 20 C.F.R. §416.910.

[7] The determination of whether a claimant has any severe impairments, at step two of the sequential evaluation process, is a threshold test. 20 C.F.R. §416.920(c). If a claimant has no impairment or combination of impairments which significantly limits the claimant's physical or mental abilities to perform basic work activities, the claimant is "not disabled" and the evaluation process

combination of impairments that meets or equals the requirements of a listed impairment,[8] (4) has the RFC to return to his or her past work and (5) if not, whether he or she can perform other work in the national economy. Id. As part of step four the ALJ must determine the claimant's RFC. Id.

RFC is the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis. See Social Security Ruling 96-8p, 61 Fed. Reg. 34475 (July 2, 1996). A regular and continuing basis contemplates full-time employment and is defined as eight hours a day, five days per week or other similar schedule. The RFC assessment must include a discussion of the individual's abilities. Id; 20 C.F.R. §416.945; Hartranft, 181 F.3d at 359 n.1 ("'Residual functional capacity' is defined as that which an individual is still able to do despite the limitations caused by his or her impairment(s).").

## MEDICAL RECORDS

Before addressing the ALJ's decision and the arguments of counsel, it is important to summarize some of the pertinent portions of Sipes's medical records.

Snipes visited Dr. Milroth, his family physician, on October 8, 11 and 12, 2001 and September 5, 2002. Tr. 265. The treatment note of October 8th indicates he was prescribed the pain medication Wygesic for "back/hip pain." Id. At the appointment of October 11th Sipes was still complaining of pain and

---

ends at step two. Id. If a claimant has any severe impairments, the evaluation process continues. 20 C.F.R. §416.920(d)-(g).

[8]If the claimant has an impairment or combination of impairments that meets or equals a listed impairment, the claimant is disabled. If not, the sequential evaluation process proceeds to the next step.

that he could "barely move around due to pain." Id. Dr. Milroth increased the dosage of Wygesic. Id. On October 12th Sipes was still complaining of pain and there was another adjustment to his medication. Id. However, there are no further treatment notes from 2001 until September 5, 2002, at which time he complained of bilateral flank pain times 1 week. Id. It also appears that Dr. Milroth ordered an abdominal and renal CT scan. Id. There are no further treatment notes from 2002. Id.

The records from SCI-Somerset reveal that Sipes received medical care at that facility for several different conditions, some noted to be temporary problems, from early January 2004 through mid-June, 2008. Tr. 214-219, 221-223, 225-227 and 230 .

The chronic medical problems listed on the SCI-Somerset records from early 2004 were polysubstance and alcohol dependence, high blood pressure, depression versus adjustment disorder, and hepatitis C virus. Tr. 216.

The SCI-Somerset medical records also report complaints of syncope (fainting), dizziness, chest pain, costochondritis,[9] headaches, kidney pain, neck pain, respiratory infections, knee pain and back pain. Tr. 215-216, 223, 227 and 230

Of particularly note is a record from February 28, 2008, when Sipes reported  to medical personnel at SCI-Somerset that he was "scrubbing walls [and] the steps" and fell hitting his right hip, forearm and calf. Tr. 227. Sipes stated, however, that he was "ok" and that "its just a little sore." Id. The results of a physical examination were normal. Id. Sipes had no visible signs of injury, including no edema or bruising and he only complained of "moderate

_____

[9]Costochondritis "is an inflamation of the cartilage that connects a rib to the breastbone. Costochondritis, Definition, Mayo Clinic staff, http://www.mayoclinic.com/health/costochondritis/DS00626.

discomfort." Id. Sipes had full range of motion and no numbness of the extremities. Id. The assessment was a "work related fall" but that no treatment was necessary other than he was given Motrin to take as needed. Id.

On March 31, 2008, Sipes was examined by a physicians assistant at SCI-Somerset. Tr. 225-226. Sipes had no complaints. Id. The results of physical examination were essentially normal. Id. Sipes was advised to lose weight, modify his diet and stop smoking. Tr. 226.

An SCI-Somerset medical progress note dated April 7, 2008, reveals that Sipes complained of right knee pain that "comes [and] goes" and numbness and burning in the "quads tendon area." Tr. 223. The results of a physical examination were essentially normal. Id. He had a negative straight leg raising test.[10] Id. Sipes was treated with nonsteroidal anti-inflammatory drugs and advised to follow-up if he had new or increased symptoms. Id.

On May 30, 2008, Sipes reported that he still had right knee pain but that Motrin was helping. Id. An x-ray was ordered and he was advised to take Motrin and follow-up as needed. Id. An x-ray performed on June 2, 2008, revealed a normal right knee. Tr. 217.

On or about June 13, 2008, Sipes was released from SCI-Somerset. Tr. 214. The medical release summary indicates that he had no physical limitations or special needs and no employment limitations. Id.

After being released from SCI-Somerset Sipes had an appointment with Dr. Milroth on September 11, 2008. Tr. 265. On that date Sipes apparently was complaining of shortness of breath, leg cramps, nausea and feeling

---

[10]The straight leg raise test is done to determine whether a patient with low back pain has an underlying herniated disc. Niccola V. Hawkinson, DNP, RN, Testing for Herniated Discs: Straight Leg Raise, SpineUniverse, http://www.spineuniverse.com/experts/testing-herniated-discs-straight -leg-raise.

"shaky." Id. Sipes was immediately sent to the emergency department at Fulton County Medical Center for an EKG. Id. The EKG or ECG revealed sinus tachycardia, that is, a rapid heart rate, possible bi-atrial enlargement and an intraventricular (IV) conduction defect. Tr. 269. The chest x-ray revealed a normal heart and "[n]o evidence to indicate an acute cardiac or pulmonary abnormality." Tr. 267. With respect to the records of the examination by Dr. Milroth and the tests performed at Fulton County Medical Center on September 11th there is an absence of a diagnostic assessment. Tr. 265-273.

On September 25, 2008, Sipes was again seen by Dr. Milroth complaining of chronic back pain from the middle of the back down into the hip. Tr. 264. It appears that Sipes had an "absent [right knee jerk]" or reflex and a positive straight leg raise test on the right. Id. Sipes was also prescribed Sterapred DS (predisone), Wygesic and the muscle relaxant Flexeril. Id.

At an appointment with Dr. Milroth on October 9, 2008, Sipes continued to complain of back pain and reported that the medications prescribed (Wygesic, Flexeril and Sterapred) were "not working." Id. It was noted that Sipes had radicular right leg pain down to the knee and a long history of back pain which had been "[a]ggravated after the fall at work last year." Id. Dr. Milroth ordered an MRI of the lumbosacral spine. Id. However, because he could not obtain a Pennsylvania Medical Assistance card, that MRI had to be delayed. Dr. Milroth prescribed Tramadol. Id.

On October 28, 2008, Sipes underwent an MRI of the lumbar spine. Tr. 266. The report of that MRI states in pertinent part as follows: "The five lumbar vertebra are in anatomic alignment. The vertebral bodies were of normal height. There was no disc space abnormality. The pars interarticularis, posterior elements, paravertebral soft tissues appear to be normal. There was no evidence to indicate herniated nucleous pulposus or spinal stenosis.

12

IMPRESSION: Normal MRI of the spine without evidence to indicate herniated nucleus pulposus or spinal stenosis." Id. On the same day Sipes reported by way of a phone call to Dr. Milroth's office that he underwent an MRI and that his back pain was worse and the Tramadol was not helping. Tr. 264. Dr. Milroth prescribed the narcotic pain medication Vicodin. Id.

Sipes was a "no show" for an appointment with Dr. Milroth on November 24, 2008. Tr. 263.

On December 5, 2008, Sipes had an appointment with Dr. Milroth to "discuss back pain." Id. Dr. Milroth prescribed Flexeril, Tramadol and Sterapred DS and ordered blood work. Id.

At an appointment with Dr. Milroth on December 15, 2008, Sipes continued to complain of back pain and that the medications other than Flexeril were not helping. Id. Dr. Milroth prescribed Flexeril and Naprosyn and referred him to physical therapy. Id.

Sipes underwent a physical therapy evaluation on December 19, 2008, at the Fulton County Medical Center and attended physical therapy sessions on December 19, 22, 24 and 30, 2008, and January 2 and 9, 2009. Tr. 235-238. The initial physical therapy evaluation revealed that Sipes's forward flexion, extension, and side bending to the right was 75% and side bending left to the left was 90% all with increased pain in the right low back. Tr. 233. The physical therapist also reported that Sipes had a positive straight leg raising test on the right and that he had slightly reduced strength in the right lower extremity but normal strength in the left lower extremity. Tr. 233. Sipes had normal deep tendon reflexes and sensation in the lower extremities. Id. The therapy session notes from December 22nd indicate that Sipes reported "he was feeling better until he twisted his back getting clothes out of the dryer." Tr. 237. On December 24th Sipes reported that "he was feeling good until he slipped on the ice in this AM onto his butt." Id. On December 30th

Sipes reported that he was "feeling great until he lifted a heavy vanity yesterday[.]" Tr. 238. On January 2nd Sipes reported that he was "feeling better and no pain this AM" and that the "discomfort 'comes and goes' in the low back." Id. Finally on January 9th, Sipes reported that "he only notices 2-4/10 pain [with] bending forward and leaning to the [right]." Id.

On January 13, 2009, Sipes had an appointment with Dr. Milroth to complete a medical assistance form. Tr. 263. It was stated that Sipes had been attending physical therapy for 3 weeks. Id. Apparently on this date Dr. Milroth referred Sipes to a pain management specialist. Id. On January 15, 2009, Dr. Milroth prescribed the drug tramadol for Sipes. Tr. 262. Subsequently, on January 23, 2009, Sipes had an appointment with Ewa M. Malinowski, M.D., a pain management specialist, at The Chambersburg Hospital. Tr. 255-256. Sipes told Dr. Malinowski that his pain ranged from a 7 to a 9 on scale of 1 to 10 but that the "pain subsides with his medications and some rest." Tr. 255. He had a normal gait and was able to heel and toe walk[11]. Id. It was reported that he had "diminished range of motion in the lumbosacral region with complaints of increased pressure especially with hyperextension" and that he had "limited lateral flexion especially to the right." Id. "Significant tenderness" was noted in the "paraspinal muscles on the right with deep palpation starting from L4 down to S1." Id. Sipes had "some tenderness over the right [sacroiliac] joint." Id. Sipes had a normal neurological examination, including normal strength in the upper and lower

---

[11]The heel walk test requires the patient to walk on his or her heels. The inability to do so suggests L4-L5 nerve root irritation. The toe walk test requires the patient to walk on his or her toes. The inability to do so suggests L5-S1 nerve root irritation. Clinical Examination Terminology, MLS Group of Companies, Inc., https://www.mls-ime.com/ articles/GeneralTopics/Clinical%20Examination%20Terminology.html.

extremities. Id. Dr. Malinowski's diagnostic assessment was that Sipes suffered from "[l]ower back pain" and could not rule out facet syndrome on the right side at L4-L5 and L5-S1 or rule out right sacroiliitis. Id. Dr. Malinowski recommended a medial branch nerve block at the L4-L5 and L5-S1 facets, prescribed pain medications and recommended that Sipes restart physical therapy. Id.

Next Sipes visited the emergency department at Fulton County Medical Center on January 26, 2009. Tr. 246-247. During that visit Sipes reported that he had "three eipidural injections done" that day "by Dr. Ali, an anesthesiologist at Chambersburg Hospital" and that "[a]bout an hour prior to presentation, he started having sharp stabbing pain in his right lower back near the site of the injections." Tr. 246. Sipes reported that he did not have any radiation of pain into his extremities and that the sharp stabbing pains were "intermittently severe" and the medications he was taking were not working but that he was not taking the tramadol that was prescribed. Id. Sipes reported that he had decreased range of motion but it was observed that he was able to ambulate without difficulty and that he was able to sit on the hospital bed without difficulty. Id. He had no vertebral point tenderness; he had intermittent and palpable spasms in the right medial paraspinous musculature at the L3, L4 and L5 levels; he had decreased range of motion primarily with respect to rotation but had some flexion intact; and he had normal muscular strength and sensation in both lower extremities. Id. Sipes was prescribed Toradol,[12] Relafen[13] and Flexeril, advised to use ice and

---

[12]Toradol is a nonsteroidal anti-inflammatory drug. Toradol, Drugs.com, http://www.drugs.com/toradol.html.

[13]Relafen is a nonsteroidal anti-inflammatory drug. Relafen, Drugs.com, http://www.drugs.com/relafen.html.

follow-up with Dr. Ali. Tr. 247.

On February 11, 2009, Sipes's physical therapist at the Fulton County Medical Center prepared a discharge summary which was approved by a physician on December 12, 2009. Tr. 239. The discharge summary reveals that Sipes had only attended 4 therapy sessions and that his attendance was considered fair. Id. The therapist stated that Sipes "progressed fairly well [with] restored lumbar mobility" and that "throughout treatment [Sipes complained of increased] pain [due to] twisting his low back and 1 fall." Id. The therapist, however, noted that "on the last 2 visits [he] had no [complaints of] pain and tolerated treatment very well." Id. The therapist also stated that Sipes was "progressed to [increased] lumbar [stabilization exercises] however [Sipes] did not return [after] visit on 1/9/09." Id. On February 12, 2009, a copy of the therapist's discharge summary was faxed to Dr. Milroth. Tr. 375.

On February 17, 2009, Dr. Malinowski administered a medial branch nerve block at the L3, L4 and L5 level of Sipes's lumbar spine on the right. Tr. 253. A physical examination performed prior to this procedure revealed that Sipes was "in no acute distress and oriented [to person, place and time] with a normal mood and affect." Id. Sipes was observed to ambulate without difficulty. Id. Sipes had "tenderness over the facet column on the right side starting from the L4 down to [the] S1 [level]." Id. Sipes had no tenderness at the L3 level. Id. Sipes had pain with hyperextension and lateral flexion and minimal discomfort with anterior flexion. Id. A straight leg raising test was negative bilaterally, he had no new neurological deficits, his muscle strength was normal in the upper and lower extremities, and his deep tendon reflexes were normal in the knees bilaterally and absent in the ankles. Id. Dr. Malinowski's diagnostic assessment was that Sipes suffered from "[l]ower back pain due to facet syndrome at the L4-L5 and L5-S1 level." Id.

In April, 2009, Sipes received a medial branch nerve injection in his

lumbar and sacral spines administered by Dr. Malinowski and also underwent radiofrequency ablation of the L2-L3 and L5-S1 nerves performed by Dr. Malinowski. Tr. 279-282. In June, August, and October, 2009, and January, 2010, Dr. Malinowski performed similar procedures. Tr. 319-328.

At an appointment with Dr. Milroth on May 7, 2009, Sipes complained of a headache which lasted 2 days accompanied by nausea. Tr. 375. On May 27, 2009, a CT scan of Sipes's head was performed at Fulton County Medical Center. Tr. 369. The impression of the physician interpreting the CT scan was as follows: "Normal unenhanced CT of the head." Id.

On May 16, 2009, Sipes was examined by Seth Tuwiner, M.D., on behalf of the Bureau of Disability Determination. Tr. 287-291. At that appointment Sipes told Dr. Tuwiner that he has had back pain since 2006, that he had extensive diagnostic testing, including MRIs and electrodiagnostic evaluation, and that he had radio frequency ablation and epidural injections. Tr. 287. Sipes told Dr. Tuwiner that he has constant aching pain ranging form 6 to 9 out of 10; that he has sharp, shooting, stabbing pain in the right leg; and that his symptoms are worse with bending, stooping, crouching and lifting. Tr. 288. Sipes reported that he was single with three children, he can do all activities of daily living, that he has no apparent difficulties of fine motor coordination, he can walk at approximately 15 minute intervals and that he can drive without limitation. Id. A physical examination performed by Dr. Tuwiner was essentially normal. His range of motion with respect to bending forward was limited to 40 degrees; he had a positive straight leg raising test on the right side; and he had patchy numbness in the right lateral leg not conforming to a nerve root or nerve distribution. Tr. 289. Sipes had no crepitus or joint deformity; he had normal muscle tone and bulk throughout; he had normal muscle strength (5/5); he had normal reflexes throughout; cervical range of motion was normal; he had a normal gait and he was able

to toe, heel and tandem walk[14] without difficulty; he had a negative Romberg test and he had normal finger-to-nose testing. Id. Dr. Tuwiner's diagnostic assessment was that Sipes suffered from a lumbosacral strain and sprain and that his symptoms suggested an L4 and/or an L5 radiculopathy but that diagnostic studies were unrevealing and his MRI study was unremarkable. Tr. 289-290. Dr. Tuwiner completed a medical source statement of Sipes's work-related functional abilities. Tr. 285-286. Dr. Tuwiner concluded that Sipes could frequently lift/carry 10 pounds and occasionally lift/carry 20 pounds; he could stand and walk 6-7 hours during an 8-hour workday; he had no limitations with respect to sitting, pushing or pulling; he could frequently bend, kneel, stoop, crouch, balance and climb; he had no limitations with respect to reaching, handling, fingering, feeling, seeing, hearing, speaking, tasting/smelling or continence; and he had no environmental limitations. Id. At the administrative hearing the vocational expert, when asked about Dr. Tuwiner's functional assessment, stated that it described the full-range of light work. Tr. 34-35.

On July 8, 2009, Mitchell Sadar, Ph.D., a psychologist, reviewed Sipes's medical records on behalf of the Bureau of Disability determination and concluded that Sipes did not suffer from a medically determinable mental impairment. Tr. 292.

On August 31, 2009, Sipes visited the emergency department of the Fulton County Medical Center complaining of pain in the right lower back which radiated down his right leg. Tr. 361. Sipes had tenderness over the lower lumbar area on the right with pain on range of motion but he was intact neurologically and his deep tendon reflexes in the lower extremities were normal. Id. The diagnostic impression was that Sipes suffered from an

---

[14]A tandem walk or gait is a method of walking where the toes of the back foot touch the heel of the front foot at each step.

"[e]xacerbation of chronic low back pain - status post rhizotomy/radiofrequency [a]blation." Id. Sipes was prescribed the pain medications Toradol and Vicodin and advised to rest and apply warm heat to the painful area and to follow-up with a specialist or his primary care physician the next day. Id. He was also advised to return to the emergency room if his symptoms worsened. Id.

On September 24, 2009, Sipes had an appointment with Dr. Milroth at which Sipes complained of low back pain, vomiting, fatigue and discolored urine. Tr. 374. Dr. Milroth gave a differential diagnosis of renal pain versus back pain and Sipes was sent to the Fulton County Medical Center on the same day for a CT scan of the abdomen and pelvis. Id. The CT scan revealed no evidence of hydronephrosis (kidney swelling as the result of the accumulations of fluid from an obstruction) but two very small (punctate) calcifications (stones), one in the upper pole and one in the lower pole of the kidney. Tr. 368. The stones were nonobstructive. Id. The CT scan also did not reveal any "evidence to indicate a lumbar spine or aortic abnormality."Id. Sipes was advised by a phone call from Dr. Milroth's office on September 25, 2009, of the results of the CT scan and told to increase his fluid intake, strain his urine and, if pain increased, to go to the emergency department. Id.

On September 26, 2009, Sipes visited the emergency department at the Fulton County Medical Center and also had an appointment with Dr. Milroth. Tr. 368 and 374. Sipes chief complaint when he visited the emergency department was back pain. Tr. 360. The results of a physical examination were essentially normal other than his back was "[t]ender, almost like a sunburn, over his bilateral lumbosacral spine area." Id. Laboratory work was basically unremarkable. Id. The diagnostic assessment was that Sipes was suffering from "[m]usculoskeletal low back pain" and he was prescribed pain medications and advised to keep an appointment with his pain management

physician. Id. The treatment notes of Dr. Milroth essentially revealed the same objective findings.

On November 17, 2009, Sipes had an appointment with Dr. Milroth at which he complained of bilateral ear pain. Tr. 373. However, there was no mention of back pain or objective findings relating thereto. Id

On January 28, 2010, Sipes had an appointment with Dr. Milroth at which he complained of low back pain but apparently reported that he had decreased right knee pain. Tr. 372. Dr. Milroth prescribed the narcotic pain medication Percocet and the muscle relaxant Flexeril.

Sipes at an appointment with Dr. Milroth on March 8, 2010, continued to report low back pain and also reported being lightheaded and dizzy. Id. Dr. Milroth prescribed Percocet and Flexeril. Id. Subsequently, on March 29, 2010, Sipes had an appointment with Dr. Milroth to fill out a "medical assistance form for disability." Id. Dr. Milroth in the disability form in a conclusory fashion without specifying any work-related functional abilities stated that Sipes was temporarily disabled 12 months or more from January 1, 2010, until January 1, 2011. Tr. 377. Dr. Milroth further stated that Sipes's primary diagnosis was disc disease of the lumbosacral spine. Id.

On June 10, 2010, Sipes visited the emergency department at the Fulton County Medical Center complaining of intermittent, sharp and stabbing chest pain which involved the bilateral chest and radiated to the back. Tr. 353-355. The final diagnostic impression was "[a]typical chest pain" and Sipes was discharged from the hospital in a "good" condition with instructions to follow-up with Dr. Milroth if symptoms were not better in one day. Tr. 355. Sipes returned to the emergency department on June 11, 2010, continuing to complain of chest pain. Tr. 356-358. The remaining results of a physical examination were essentially normal. Id. An echocardiogram was performed which revealed "borderline left ventricular systolic function with [ejection

fraction] in the range of 50-55%" and there was "no segmental disease and . . . no valvular disease and the aorta [was] not enlarged." Tr. 352. The diagnostic impression was acute coronary syndrome.[15] Tr. 358.

On June 14 and 24, 2010, Sipes had appointments with Dr. Milroth at which he continued to complain of chest pain. Tr. 371-372. On July 6, 2010, Sipes underwent a stress test at the cardiology clinic of Fulton County Medical Center which revealed "normal systolic function, no evidence of ischemia." Tr. 350-351. After this stress test, there are no further cardiac complaints by Sipes noted in the record.

On October 18, 2010, Sipes had an appointment with Dr. Milroth at which he complained of neck pain, a headache and nausea. Tr. 371. Dr. Milroth prescribed Flexeril and Tramadol. Id.

On October 20, 2010, Sipes visited the emergency department of the Fulton County Medical Center complaining of a headache. Tr. 347-349. The results of a physical examination were essentially normal, including normal motor function, reflexes and sensation. Tr. 348. A CT scan of the head was ordered which revealed "[s]inusitis involving the ethmoid and sphenoid sinuses" but "[n]o acute [central nervous system] abnormality[.]" Tr. 365. The diagnostic impression was that Sipes suffered from a migraine headache. Tr. 349. He was prescribed medications and discharged from the hospital with instructions to follow-up with Dr. Milroth within 2 days. Id.

On October 21, 2010, Sipes had an appointment with Dr. Milroth at which he complained his headaches were getting worse and he stated that

---

[15]"Acute coronary syndrome is a term used for any condition brought on by sudden, reduced blood flow to the heart. Acute coronary syndrome, Definition, Mayo Clinic Staff, Mayo Clinic, http://www.mayoclinic.org/diseases-conditions/acute-coronary-syndrome/basics/definition/CON-20033942.

Tramadol was making them worse. Tr. 370-371. Dr. Milroth stated that his diagnostic assessment was sinusitis and he prescribed the antibiotic Augmentin and the pain medication Naprosyn. Id.

On October 28, 2010, Sipes had an appointment with Dr. Milroth to have a document entitled "Lumbar Spine Residual Functional Capacity Questionnaire" completed. Tr. 194-197, 329-332 and 370. The only objective findings recorded in Dr. Milroth's medical notes of this appointment are Sipes's vital signs. In the questionnaire Dr. Milroth stated that Sipes's diagnosis was "arthropathy lumbar facets radiculopathy [right]" and that Sipes's prognosis was poor. Tr. 194. When asked to identify the clinical findings, laboratory test results that show Sipes's medical impairments, Dr. Milroth merely stated "pain clinic has x-rays [and] scans." Id. Dr. Milroth went on to identify Sipes's subjective complaints (i.e., numbness right leg when standing and sitting and radiating pain from the back to the buttock and then to the knee) and also noted in the questionnaire but not the medical notes of that same day the following: (1) what appears to be a positive straight leg raising test at 45 degrees on the left and 20 degrees on the right; (2) sensory loss without specifying where the loss was located on the body and the degree of the loss; and (3) muscle weakness without specifying the muscle groups or extremities and the degree of weakness. Tr. 195. With respect to Sipes's work-related functional abilities, Dr. Milroth stated that Sipes could only stand 15 minutes at one time "before needing to sit down, walk around, etc;" Sipes in an 8-hour workday could only sit and stand/walk less than 2 hours; Sipes will need to take unscheduled breaks of at least 15 minutes every hour during an 8-hour workday; Sipes can frequently lift and carry less than 10 pounds, occasionally lift and carry 10 pounds, rarely lift and carry 20 pounds and never lift and carry 50 pounds; Sipes can never twist, stoop, crouch/squat or climb ladders and only rarely climb stairs; and Sipes will have

"good days" and "bad days" and is likely to be absent from work more than four days per month. Tr. 196-197. When asked to do so, Dr. Milroth did not specify the earliest date that Sipes's limitations arose. Tr. 197. The vocational expert who testified at the administrative hearing stated that if Dr. Milroth's assessment of Sipes was accepted as accurate there would be no full-time employment that Sipes could perform. Tr. 36-37.

After the ALJ issued his decision, Sipes submitted additional medical evidence to the Appeals Council, Tr. 378-385. However, evidence submitted after the ALJ's decision cannot be used to argue that the ALJ's decision is not supported by substantial evidence. Matthews v. Apfel, 239 F.3d 589, 594-595 (3d Cir. 2001). Therefore such submissions are not relevant and need not be considered.

## DISCUSSION

The ALJ at step one of the sequential evaluation process found that Sipes had not engaged in substantial gainful work activity since January 14, 2009, the date Sipes filed his application for SSI benefits. Tr. 14.

At step two of the sequential evaluation process, the ALJ found that Sipes had the following severe impairments: "Right-Sided Facet Joint Syndrome at L4-5 and L5-S1; Right Sacroiliitis; and Obesity[.]" Id. The administrative law judge found that Sipes's headaches, high blood pressure, elevated lipids, kidney stones and atypical chest pain were non-severe impairments and that although the medical records from SCI-Somerset listed depression as one of Sipes's chronic health problems it was not a medically determinable impairment. In so finding the administrative law judge stated in pertinent part as follows:

> The record documents a diagnosis of migraine headaches from
> an acceptable medical source[.] However, repeated CT scans of
> the claimant's head in September 2008, May 2009, and June

2010,[16] have been negative for a significant acute or chronic underlying abnormality that could be causing the claimant's headaches[.] With medication management and occasional emergency department treatment of severe migraines, the claimant's headaches have been generally controlled and occur infrequently[.] Because the claimant's headaches apparently do not cause more than minimal limitations in functioning,I find this medically determinable impairment not severe. The medical records all make brief mention of treatment for hypertension, elevated lipids, kidney stones, and atypical chest pain; however, these impairments do not appear to have lasted for twelve months or resulted in more than minimal limitations in the claimant's functioning[.] Therefore, I find these impairments not severe.

*    *    *    *    *    *    *

[T]he claimant stated in the record that he was not alleging any mental health disorders as part of his disability, and has no difficulty with memory, completing tasks, concentration, understanding, following instructions, paying attention, handling stress or changes in routine, or getting along with others, including authority figures, family, friends, and neighbors due to any mental health condition [.] The state agency psychological consultant opined the claimant's medical records did not document a medically determinable mental health impairment, and I have received no evidence since the State agency psychological consultant issued that opinion that would reasonably change the outcome. Therefore, I find no medically determinable mental impairment.

Tr. 14-15. Our review of the medical records reveals that the ALJ was correct in finding Sipes's migraines, high blood pressure, elevated lipids, kidney stones and atypical chest pain were non-severe impairments and that he did

---

[16]It appears that the ALJ meant to indicate October, 2010, because there was an echocardiogram in June, 2010. Tr. 352 and 365.

not have a medically determinable mental impairment.

At step three of the sequential evaluation process the ALJ found that Sipes's impairments did not individually or in combination meet or equal a listed impairment. Tr. 15. Sipes has not challenged the ALJ's step three analysis.

At step four of the sequential evaluation process the ALJ found that Sipes had no past relevant work but that he could perform the full-range of light work as defined in the regulations of the Social Security Administration. In setting the residual functional capacity, the ALJ reviewed the medical records and considered several other items including the opinions of the state agency consultants, Dr. Tuwiner and Dr. Sadar, and the opinion of Dr. Milroth. Tr. 15-20. Also, in arriving at the RFC the ALJ found that Sipes's statements about his functional limitations were not credible to the extent they were inconsistent with the above RFC. Tr. 20.

Based on the RFC of the full-range of light work and the defendant's age, education and the testimony of a vocational expert, the ALJ proceeded to step five of the sequential evaluation process and utilizing the Medical Vocational Guidelines, Rule 202.20, found that Sipes was not disabled. Tr. 21.

The ALJ did an appropriate review of Sipes's medical history and vocational background in his decision. Tr. 12-22. Furthermore, the brief submitted by the Commissioner sufficiently reviews the medical and vocational evidence in this case. Doc. 9, Brief of Defendant.

Sipes's main argument is that the ALJ inappropriately considered and rejected the opinions of Dr. Milroth. He also argues that the ALJ erred by finding that Sipes could perform the full-range of light work and by applying Medical-Vocational Rule 202.20. Following review of the record in this case it appears that Sipes's arguments are misplaced.

Initially it is noted that no treating physician submitted a functional assessment of Sipes which indicated that he was functionally impaired from a mental standpoint for the requisite continuous 12 month period. Second, Dr. Milroth's disability opinion of March 29, 2010, and his functional assessment of October 28, 2010, were not supported by objective findings in his treatment notes and were contradicted by the opinion of Dr. Tuwiner. Other than Dr. Milroth, no physician indicated that Sipes was incapable, from a physical standpoint, of engaging in the full-range of light work set by the ALJ on a full-time basis.

The ALJ rejected the disability opinion and functional assessment of Dr. Milroth. The Court of Appeals for this circuit has set forth the standard for evaluating the opinion of a treating physician in Morales v. Apfel, 225 F.3d 310 (3d Cir. 2000). The Court of Appeals stated in relevant part as follows:

> A cardinal principle guiding disability eligibility determinations is that the ALJ accord treating physicians' reports great weight, especially "when their opinions reflect expert judgment based on a continuing observation of the patient's condition over a prolonged period of time." . . . The ALJ must consider the medical findings that support a treating physician's opinion that the claimant is disabled. In choosing to reject the treating physician's assessment, an ALJ may not make "speculative inferences from medical reports" and may reject "a treating physician's opinion outright only on the basis of contradictory medical evidence" and not due to his or her own credibility judgments, speculation or lay opinion.

Id. at 317-18 (internal citations omitted). The ALJ is required to evaluate every medical opinion received. 20 C.F.R. §404.1527(d). In the present case, the ALJ in his decision specifically addressed the opinion of Dr. Milroth as well as the credibility of Sipes. Tr. 15-20.

The social security regulations specify that the opinion of a treating physician may be accorded controlling weight only when it is well-supported

by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in the case. 20 C.F.R. §404.1527(d)(2); SSR 96-2p. Likewise, an ALJ is not obliged to accept the testimony of a claimant if it is not supported by the medical evidence. An impairment, whether physical or mental, must be established by "medical evidence consisting of signs, symptoms, and laboratory findings," and not just by the claimant's subjective statements. 20 C.F.R. §404.1508 (2007). The ALJ appropriately considered the contrary opinion of Dr. Tuwiner and the objective medical evidence and concluded that the opinion of Dr. Milroth was not adequately supported by objective medical evidence consisting of signs, symptoms and laboratory findings.

The ALJ relied on the opinion of Dr. Tuwiner, the state agency physician, who examined Sipes. The administrative law judge's reliance on that opinion was appropriate. See Chandler v. Commissioner of Soc. Sec., 667 F.3d 356, 362 (3d Cir. 2011)("Having found that the [state agency physician's] report was properly considered by the ALJ, we readily conclude that the ALJ's decision was supported by substantial evidence[.]").

To the extent that Sipes argues that the ALJ did not properly consider his credibility, the ALJ was not required to accept Sipes's claims regarding his physical or mental limitations. See Van Horn v. Schweiker, 717 F.2d 871, 873 (3d Cir. 1983)(providing that credibility determinations as to a claimant's testimony regarding the claimant's limitations are for the ALJ to make). It is well-established that "an [ALJ's] findings based on the credibility of the applicant are to be accorded great weight and deference, particularly since [the ALJ] is charged with the duty of observing a witness's demeanor . . . ." Walters v. Commissioner of Social Sec., 127 f.3d 525, 531 (6th Cir. 1997); see also Casias v. Secretary of Health & Human Servs., 933 F.2d 799, 801 (10th Cir. 1991)("We defer to the ALJ as trier of fact, the individual optimally

positioned to observe and assess the witness credibility."). Because the ALJ observed and heard Sipes testify, the ALJ is the one best suited to assess his credibility.

It appears that the ALJ appropriately took into account all of Sipes's mental and physical limitations in the RFC assessment.

As for Sipes's argument that the ALJ erroneously applied Rule 202.20 because Sipes had nonexertional limitations, the fact is that the ALJ did not have to except those nonexertional limitation. Furthermore, under certain circumstances the Medical-Vocational Guidelines can be utilized when additional limitations exist. Those instances are where a vocational source is consulted or a vocational expert testifies and the vocational source or expert indicate that the additional limitations would not impact the occupational base. Section 200.00(e) of the Medical-Vocational Guidelines states:

> (e) Since the rules are predicated on an individual's having an impairment which manifests itself by limitations in meeting the strength requirements of jobs, they may not be fully applicable where the nature of an individual's impairment does not result in such limitations, e.g., certain mental, sensory, or skin impairments. In addition, some impairments may result solely in postural and manipulative limitations or environmental restrictions. Environmental restrictions are those restrictions which result in inability to tolerate some physical feature(s) of work settings that occur in certain industries or types of work, e.g., an inability to tolerate dust or fumes. Under certain circumstances the Medical-Vocational Guidelines can be utilized when additional limitations exist. Those instances are where a vocational source is consulted or a vocational expert testifies and the vocational source or expert indicates that the additional limitations would not impact the occupational base.

Appendix 2 to Subpart P of Part 404 – Medical Vocational Guidelines. When certain limitations (e.g., postural and environmental) may impact the number

of occupations available in a particular exertional category, Social Security Ruling 83-12 gives further guidance. That Ruling states in pertinent part as follows:

> Each numbered [Vocational] rule directs a conclusion as to whether an individual in a specific case situation is able to make an adjustment to work other than that previously performed. The decision is based on the remaining occupational base, as determined by [RFC], in conjunction with his or her age, education, and work experience. . . .
>
> Where an individual exertional RFC does not coincide with the definitions of any one of the ranges of work . . . the occupational base is affected and may or may not represent a significant number of jobs in terms of the rules directing a conclusion as to disability. The adjudicator will consider the extent of any erosion of the occupational base and access its significance. In some instances, the restriction will be so slight that it would clearly have little effect on the occupational base. In cases of considerably greater restriction(s), the occupational base will obviously be affected. In still other instances, the restrictions of the occupational base will be less obvious.
>
> Where the extent of erosion of the occupational base is not clear, the adjudicator will need to consult a vocational resource. The publications listed in sections 404.1566 and 416.966 of the regulations will be sufficient for relatively simple issues. In more complex cases, a person or persons with specialized knowledge would be helpful.

SSR 83-12.

Under the above ruling the Medical-Vocational Guidelines can be utilized even when additional limitations exist. Those instances are where a vocational source is consulted or a vocational expert testifies and the vocational source or expert indicates that the additional limitations would not

impact the occupational base. In the present case, the vocational expert testified that Dr. Tuwiner's functional assessment described the full-range of light work and the ALJ accepted the opinion of Dr. Tuwiner and rejected the opinion of Dr. Milroth. As stated the ALJ accepted Dr. Tuwiner functional capacity assessment of Sipes and the vocational expert testified regarding that assessment which described the full-range of light work. Consequently, the arguments raised by Sipes that he had nonexertional impairments which prevented the ALJ from utilizing the Medical-Vocational Guidelines are incorrect.

Finally, as noted above, the evidence submitted by Sipes to the Appeals Council after the ALJ's decision is not a basis to reverse the ALJ's decision or remand for further proceedings.

After review of the administrative record, it appears that the decision of the Commissioner is supported by substantial evidence. Therefore, pursuant to 42 U.S.C. §405(g) the decision of the Commissioner is Affirmed.

An appropriate order will follow.


s/ *Malachy E. Mannion*
**MALACHY E. MANNION**
**United States District Judge**


Dated: January 16, 2014

O:\Mannion\shared\MEMORANDA - DJ\CIVIL MEMORANDA\2012 MEMORANDA\12-1097-01.wpd